UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**Daniel Oehlwein,**

*Plaintiff,*

v.

Case Number:

**LJP Consulting LLC, Alonzo J.
Primus, Bret Allen Crandall,
Unknown Companies 1-10,** *and*
**Unknown ACH Processor,**

**JURY TRIAL DEMANDED**

*Defendants.*

## COMPLAINT AND DEMAND FOR JURY TRIAL

COMES NOW the Plaintiff, **Daniel Oehlwein** ("**Mr. Oehlwein**"), by and through his attorneys, Seraph Legal, P.A., and complains of the Defendants, **LJP Consulting LLC** ("**LJP**"), **Alonzo J. Primus** ("**Primus**"), **Bret Allen Crandall** ("**Crandall**"), **Unknown Companies 1-10**, and **Unknown ACH Processor** (collectively, the "**Defendants**"), stating as follows:

## PRELIMINARY STATEMENT

1.      This is an action for damages brought by Mr. Oehlwein against the Defendants for violations of the *Racketeer Influenced and Corrupt Organizations Act*, 18 U.S.C. § 1961, *et seq.* ("**RICO**"), and Florida's *Civil Remedies for Criminal Practices Act* ("**CRCPA**"), § 772.101, Fla. Stat., *et seq.*

## JURISDICTION AND VENUE

2.      Subject matter jurisdiction for Plaintiff's RICO claims arises under 18 U.S.C. § 1965 and 28 U.S.C. § 1331, as RICO is a federal statute.

3.      This Court has supplemental jurisdiction for Mr. Oehlwein's state law claims pursuant to 28 U.S.C. § 1367.

4.      The Defendants are subject to the jurisdiction of this Court pursuant to Fed. R. Civ. P. 4(k) and § 48.193, Fla. Stat.

5.      Venue is proper in the Middle District of Florida, pursuant to 28 U.S.C. § 1391(b)(2), because the events giving rise to this cause of action occurred within this District.

## PARTIES

### Mr. Oehlwein

6.      **Mr. Oehlwein** is a natural person who at all times relevant has resided in Polk County, Florida.

### LJP

7.      **LJP** is a Delaware limited liability company.

8.      Upon information and belief, LJP is at least 50% owned by Primus.

9.      The registered agent in Delaware for LJP is **Harvard Business Services, 16192 Costal Highway, Lewes, DE 19958.**

## Crandall

10.     Crandall is a natural person.

11.     Crandall is believed to be a citizen of Maryland.

12.     Crandall is believed to reside at **1707 Randall Dr., Solon, IA 52333**, or

**1413 Foxwood Court, Annapolis, MD 21409**.

13.     On information and belief, Crandall is employed by the **Wakpamni**

**Lake Community Corporation** ("**WLCC**") as director of compliance.

14.     Crawford is involved in the day-to-day operations of WLCC, and is

responsible for the determination of, and implementation of, the policies and

procedures of WLCC.

15.     Crawford is responsible for reviewing any and all regulations

affecting WLCC, or alternatively, is responsible for hiring personnel to ensure the

WLC is in compliance with those regulations.

## Primus

16.     Primus is a natural person.

17.     Primus is a managing member of LJP.

18.     Primus is involved in the day-to-day operations of WLCC, and is

responsible for the determination of, and implementation of, the policies and

procedures of LJP.

19.     Primus is responsible for reviewing any and all regulations affecting LJP, or alternatively, is responsible for hiring personnel to ensure LJP is in compliance with those regulations.

20.     Primus is an officer in many other corporate entities.

21.     Primus is believed to reside at **9909 Via Bernini, Lake Worth, FL 33467.**

<u>**Unknown Companies 1-10**</u>

22.     Unknown Companies 1-10 are entities involved in the making of short-term, high-interest, and small-dollar loans through the website ArrowheadAdvance.com ("Arrowhead Advance").

23.     Arrowhead Advance purports to be owned by WLCC II, an entity which itself claims to be owned by WLCC.

24.     Unknown Companies 1-10 each provided services on loans issued by Arrowhead Advance, such as providing capital to fund the loans, providing banking services, access to nationwide payment networks, debt collection, and more.

25.     Plaintiff believes he can ascertain the identity of Unknown Companies 1-10 since it/their true name(s) are recorded in business records, such as domain name registration records, which Plaintiff should uncover in discovery.

26.     Upon uncovering the identity(ies) of such entity(ies), Plaintiff will amend his complaint.

### Unknown ACH Processor

27.     Unknown ACH Processor is the person or entity who, at all times relevant, processed the *Automated Clearing House* ("**ACH**") payment transactions for Arrowhead Advance.

28.     Plaintiff believes he can ascertain the identity of Unknown ACH Processor since it/they utilize a unique Prearranged Payment and Deposit Identification number ("PPD ID"), which Plaintiff should uncover in discovery.

### FACTUAL ALLEGATIONS

### Usurious Lending Prohibited in Florida

29.     The State of Florida has long recognized that lending money at usurious interest rates is immoral, harmful, and contrary to public policy.

30.     Section 687.071(2), Fla. Stat., renders the making of loans with annual interest rates greater than 25% but less than 45% a second-degree misdemeanor.

31.     Section 687.071(3), Fla. Stat., renders the making of loans with annual interest rates greater than 45% a third-degree felony.

32.     Section 687.071(7), Fla. Stat., states, "No extension of credit made in violation of any of the provisions of this section shall be an enforceable debt in the courts of this state."

33.     Any person who makes a loan with an annual interest rate exceeding 25%, in addition to subjecting themselves to criminal sanctions, forfeits the right to collect payment for the loan, as such loans are "void as against the public policy of the state as established by its Legislature." *Richter Jewelry Co. v. Schweinert*, 169 So. 750, 758-59 (Fla. 1935).

34.     Florida law further prohibits any recovery of the principal of a loan with an annual interest rate exceeding 25%. *Rollins v. Odom*, 519 So. 2d 652, 656 (Fla. Dist. Ct. App. 1988).

35.     The purpose of the usury statutes is to protect the needy borrower by penalizing the unconscionable money lender. *Stubblefield v. Dunlap*, 4 So.2d 519 (1941); *see also Pushee v. Johnson*, 166 So. 847 (1936); *River Hills, Inc. v. Edwards*, 190 So.2d 415 (Fla. 2d DCA 1966).

36.     Any amount repaid on an illegal, usurious debt deemed void *ab initio* by state law constitutes unjust enrichment, even if less than the original amount of the loan. *See, e.g., Williams, et al. vs. Big Picture Loans, LLC*, case 3:17-cv-461, E.D. Virginia, July 20, 2021.

## Defendants Make Usurious Loan to Mr. Oehlwein

37.     On or about February 27, 2019, Arrowhead Advance made a $700 loan to Mr. Oehlwein (the "**Loan**").

38.     The stated interest rate of the Loan exceeded **700%** annually.

39.    The principal amount was transferred to Mr. Oehlwein's bank account in Florida, via ACH credit.

40.    Because the Loan's interest rate vastly exceeded the 25% limit as proscribed in § 687.071(2), Fla. Stat., the Loan was void *ab initio* in Florida.

41.    As such, the Loan is an *Unlawful Debt* as defined by § 772.102(2), Fla. Stat.

42.    As the Loan charged interest more than double the rate permitted by Florida law, the Loan is an *Unlawful Debt* per 18 U.S.C. § 1961(6).

43.    Mr. Oehlwein made payments toward the Loan.

44.    Unknown ACH Processor processed withdrawals from Mr. Oehlwein's bank account to pay for the Loan.

45.    Arrowhead Advance, in furtherance of its collection efforts, reported the Loan to multiple nationwide consumer credit reporting agencies ("CRAs"), including Clarity Services. **SEE PLAINITFF'S EXHIBIT A.**

46.    Because Arrowhead Advance chose to report the Loan to CRAs, it was required to report accurate information.

47.    Per Arrowhead Advances own reporting, Mr. Oehlwein timely made semimonthly payments between March 15, 2019 and May 31, 2019. *Id.*

48.    However, Arrowhead Advance claimed Mr. Oehlwein still owed more than $780. *Id.*

## Arrowhead Advance's Business Model

49.   Arrowhead Advance is an online payday lender operating from the website www.arrowheadadvance.com.

50.   Arrowhead Advance's website states that its loans made to Florida residents incur 773.82% to 776.36% annual interest. Arrowhead Advance, https://www.arrowheadadvance.com/rates (last visited September 20, 2022). **SEE PLAINTIFF'S EXHIBIT B.**

51.   A borrower from Florida receiving a $250 loan from Arrowhead Advance will pay $1,106.25 for the loan if bi-weekly payments are made as scheduled. *Id.*

52.   Arrowhead Advance's website states that "the [annual percentage rate] on an Arrowhead Advance loan can range from 200% to 830% depending on the duration of the loan, the loan fees incurred and other factors."

53.   Arrowhead Advance claims to be owned by WLCC II, which is a subsidiary of the WLCC, which is a tribal corporation wholly owned by the Wakpamni Lake Community. *See* https://www.arrowheadadvance.com/ (last visited September 20, 2022).

54.   WLCC states it is "incorporated under and governed by the laws of the Oglala Sioux Tribe," although it notes it "operates independently of the Oglala Sioux Tribe." *Id.*

55.     Since WLCC is an enterprise purportedly owned by the Oglala Sioux Tribe, a federally recognized Native American tribe, Arrowhead Advance claims to be a "tribal" entity that has sovereign immunity from criminal prosecution regarding its lending practices that constitute felony usury in many states, including Florida.

56.     However, WLCC II and the WLCC are not, themselves, a sovereign tribe.

57.     In order for a purportedly-tribal entity to assert the tribe's immunity, it must operate as a legitimate "arm of the tribe."

58.      The idea that Arrowhead Advance operates as a legitimate arm of the Oglala Sioux Tribe is a farce.

59.     Primus, through LJP and his other subsidiaries and investors, are the primary beneficiaries of Arrowhead Advance and its payday lending website.

60.     WLCC was established by Raycen American Horse Raines ("**Raines**") in 2012, when he persuaded certain members of the Oglala Sioux Tribe to act as a payday lending cover for a non-tribal entity based in Arizona called Cash Cloud, LLC ("**Cash Cloud**").

61.     Raines' pitch was straight-forward: the Oglala Sioux Tribe would use their sovereign immunity to shield Cash Cloud from state law restrictions on usurious interest rates.

62.     In return, Cash Cloud would pay a fee of $5 per new loan to the Oglala Sioux Tribe.

63.     If more than $100,000 of fees per month were earned, the rate would then be lowered to $2.50 per loan.

64.     Cash Cloud would make loans to consumers at rates of more than 782% annual interest per year.

65.     Cash Cloud operated primarily for the benefit of Chad Jardine and Blake Collins, neither of whom are members of the Oglala Sioux nor any other Indian tribe.

66.     The Oglala Sioux had virtually no involvement in the actual business of making loans to consumers.

67.     Such a scheme is often referred to as a "rent-a-tribe" agreement.

68.     In "rent-a-tribe" schemes, non-tribal payday lenders attempt to circumvent state and federal laws that prohibit usurious loans from being issued.

69.     Non-tribal payday lenders do this by issuing loans in the name of a Native American tribal business entity that purports to be shielded from state and federal law via tribal sovereign immunity.

70.     The tribal lending entity, however, is a mere "front" for an illegal lending scheme.

71.    All substantive aspects of the payday lending operation – funding, marketing, loan origination, underwriting, loan servicing, electronic funds transfers, and collections – are performed by individuals and entities that are unaffiliated with the tribe, referred to as "service providers."

72.    In exchange for use of the tribe's name and on-paper ownership of the lending website, the service providers pay the cooperating tribe a fraction of the revenues generated.

### Primus and First Bank of Delaware's Rent-A-Bank Schemes

73.    From around May 2000 through December 2011, Primus was Chief Executive Office and Chief Financial Officer of the First Bank of Delaware ("FBOD").

74.    During his tenure at FBOD, Primus oversaw a "rent-a-bank" scheme between FBOD and Think Finance, which offered a loan product called ThinkCash that offered short-term online loans at interest rates often exceeding 200% annually.

75.    Think Finance used FBOD's status as a bank to import interest rates from FBOD's home state to states with stricter usury laws.

76.    FBOD received 10% of revenues from the loans for the use of its name, and its agreement to be the lender of record, on paper at least.

77.     Think Finance retained the other 90% and, through a network of subsidiaries and related companies, performed all day-to-day operations.

78.     Moreover, Think Finance and its affiliated entities provided the actual working capital to make the loans, not FBOD.

79.     Beginning in 2008, the Federal Deposit Insurance Corporation ("FDIC") took steps to shut down Think Finance's arrangement with First Bank of Delaware through a cease and desist ordering it to terminate its relationship with "all third-party lending programs."

80.     By November 2011 – when Primus was still CEO – the FBOD was accused of knowingly and willfully facilitating more than $100 million of fraudulent transactions.

81.     Ultimately, the FBOD paid $16 million in fines, was stripped of its banking charter, and its remaining assets liquidated.

## Primus' Rent-A-Tribe Schemes

82.     Both Primus and Think Finance soon reincarnated their "rent-a-bank" model with a substantially similar "rent-a-tribe" one.

83.     Think    Finance    began    making    Loans    through www.Plaingreenloans.com, at interest rates of up to 500% annually.

84.    The loans were, ostensibly, made by the Chippewa Cree Tribe of Rocky Boy's Indian Reservations, a small, impoverished tribe in a remote part of Montana.

85.    Primus helped organize the Princeton Alternative Income Fund, LP ("PAIF").

86.    Primus holds, or, at all relevant times, held, the title of Chief Credit Officer of PAIF.

87.    PAIF's objective was to raise capital and invest it in lending enterprises which made risky, short-term, high-interest loans to consumers unable to access credit from traditional lending sources.

88.    Around 2012, Primus made deals with Geneva Lone Hill, the president of the WLCC, and other WLCC executives, in which the WLCC would claim ownership of Arrowhead Advance and would in exchange receive roughly two percent of revenue.

89.    In March 2013, the WLCC passed a resolution establishing WLCC II, a tribal LLC which would "own" Arrowhead Advance.

90.    On October 29, 2014, the WLCC passed its resolution number 2014-40, establishing Raines and Primus as the only two approved signers for any bank accounts in the name of the WLCC II.

91.     By December 2014, archives of ArrowheadAdvance.com show the website was operational and making loans, noting WLCC II D/B/A Arrowhead Advance is a subsidiary agency of the WLCC.

92.     Primus also represented himself to be the "CEO" of the WLCC II, sometimes using ljpconsulting@gmail.com as a contact e-mail address for himself.

93.     Initially, Worldwide Analytics, LLC ("Worldwide"), which operated from offices at 650 Naamans Road., Suite 300, Claymont, Delaware, serviced and collected Arrowhead Advance loans.

94.     Archived Domain Name Registration records from April 2, 2014, show that arrowheadadvance.com was registered to Terry Wall, Worldwide Analytics, 650 Naamans Rd., Suite 300, Claymont, DE 19703, email twall@wwanalytics.com, phone 267-971-2892. **SEE PLAINTIFF'S EXHIBIT C.**

95.     Terry Wall was the Chief Technology Officer of Worldwide and its director of information technology.

96.     Records of inquiries for consumer credit bureau reports from Trans Union LLC ("Trans Union"), a nationwide CRA**,** show the address from which the inquiry is submitted is listed as 650 Naamans Rd., Suite 300, Claymont, DE 19703. **SEE PLAINTIFF'S EXHIBIT D.**

97.     Primus, through LJP and his related companies and their contractors and hired agents, effectively control almost all aspects of Arrowhead Advance,

including underwriting decision making, collection strategies, credit reporting, and the sale of charged-off debts to debt collectors.

98.    Primus, LJP, and other related companies and investors provided a line of credit to WLCC II, which was used as working capital to fund Arrowhead Advance loans.

99.    Primus, through LJP and his related companies and investors, maintained a security interest in those loans.

100.    The line of credit agreement required the WLCC to:

   a.    waive any sovereign immunity claims in the event of a dispute between the WLCC and Primus/LJP,

   b.    employ only contractors approved by Primus and LJP, and

   c.    provide priority treatment in the payment of money due to Primus, LJP, and his related investors.

101.    These restrictive covenants, among others, gave Primus, LJP, and his non-tribal investors effective control over the WLCC II, despite its on-paper ownership by WLCC II.

102.    RICO defines an "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1691(4) 102.

103.    In *Boyle v. United States*, the Supreme Court recognized that RICO's definition of enterprise was "obviously broad" and included an "association in fact" enterprise. 556 U.S. 938, 944 (2009).

104.    Here, Defendants are an association in fact enterprise who are associated for the common purpose of making, collecting, and profiting off unlawful loans.

105.    As the Defendants go to great lengths to obscure their tracks through a plethora of different shell companies and inter-related corporations – Primus alone owns HP Funding LLC, HP Funding II LLC, RAP Funding LLC, Learn2Comply LLC, VP Compliance Services LLC, and others – Plaintiff cannot, prior to discovery, unravel the large knot of entities which comprise the Arrowhead Advance enterprise, and thus refers to these as-of-yet undetermined entities as Unknown Companies 1-10.

106.    Plaintiff believes Unknown Companies 1-10 include at least one domestic, FDIC-insured bank, as well as other entities providing marketing services, call center operations, debt collection, and data analytics.

**Crandall's Involvement**

107.  On information and belief, Crandall, by virtue of his employment with the WLCC, helped facilitate the "rent-a-tribe" scheme between the WLCC and Primus, LJB, and other non-tribal individuals.

108.    Crandall was aware of the interest rates charged by Arrowhead Advance.

109.    Crandall facilitated the agreements in order to provide the guise of tribal ownership for loans made by Arrowhead Advance.

110.    Among other activities managed and performed by Crandall, he responds to complaints filed with consumer advocacy organizations like the Better Business Bureau.

111.    In his responses, Crandall indicates that the loans are made by a Native American tribe, and thus "legal."

**Illegal Loans Took Place in Florida and are Subject to Florida Law**

112.    Arrowhead Advance's web server's IP address is 69.90.153.168, which corresponds to a physical location in Kansas, more than 1,000 miles from the Oglala Sioux's reservation.

113.    Mr. Oehlwein, like most Arrowhead Advance customers, acquired the Loan without leaving his home state of Florida.

114.    The Loan proceeds were deposited into his bank account in Polk County, Florida.

115.    Thus, Arrowhead Advance's lending does not actually occur on the Tribe's reservation.

116.    A significant majority of the transaction occurs within the State of Florida – from completing the application to receiving the funds.

117.    Mr. Oehlwein has never set foot on the Oglala Sioux's land in South Dakota.

118.    The Loan occurred in Florida, and is governed by the laws of the State of Florida because:

      a.    the Loan was requested and obtained in Florida,

      b.    the proceeds of the Loan were wired to a Florida bank,

      c.    payments were debited from a Florida bank, and

      d.    collection text messages, emails, and phone calls were made to Mr. Oehlwein at his home in Florida.

119.    In addition to the money repaid by Mr. Oehlwein on the Loan, Mr. Oehlwein had actual damages resulting from diminished credit scores and capacity, damage to his reputation, and emotional distress.

120.    Mr. Oehlwein has hired the aforementioned law firm to represent him in this matter and has assigned his right to fees and costs to such firm.

**COUNT I**
**<u>VIOLATIONS OF RICO, 18 U.S.C § 1962(a)</u>**
**<u>ALL DEFEDNANTS</u>**

121.    Mr. Oehlwein adopts and incorporates Paragraphs 1 – 120 as if fully restated herein.

122.    The Defendants, through their joint operation of Arrowhead Advance, constitute an "enterprise" as defined by 18 U.S.C. § 1961(4).

123.    The Loan was made to a Florida resident, in Florida, and charged an annual interest rate more than twice Florida's maximum permitted rate, making the Loan an "unlawful debt" pursuant to 18 U.S.C. § 1961(6).

124.    The Defendants each received proceeds, directly or indirectly, from the collection of the Loan.

125.    The Defendants, as principals per 18 U.S.C. § 2, each used or invested, directly or indirectly, a portion of the income derived from the collection of the Loan to acquire or further establish or operate the enterprise.

126.    The Defendants utilized the internet, telephone, and mail to reach across state lines in the operation of the enterprise, including through

      a.    collection communication,

      b.    credit reporting,

      c.    ACH withdrawals from Mr. Oehlwein's Florida bank account, and/or

      d.    ACH deposits to Mr. Oehlwein's Florida bank account.

127.   The Defendants' business model evinces their knowledge of the illegal nature of the Loan, as they go to great lengths to obfuscate how, and by

whom, the Loan was made, attempting to deceive consumers into believing that they have no legal recourse against its enforcement.

128.   Accordingly, the Defendants are jointly and severally liable to Mr. Oehlwein for treble damages, costs, and attorney's fees pursuant to 18 U.S.C. § 1964(c).

## COUNT II
## VIOLATIONS OF RICO, 18 U.S.C § 1962(b)
## ALL DEFEDNANTS

129.   Mr. Oehlwein adopts and incorporates Paragraphs 1 – 120 as if fully restated herein.

130.   The Defendants, through their joint operation of Arrowhead Advance, constitute an "enterprise" as defined by 18 U.S.C. § 1961(4).

131.   The Loan was made to a Florida resident, in Florida, and charged an annual interest rate more than twice Florida's maximum permitted rate making the Loan an "unlawful debt" pursuant to 18 U.S.C. § 1961(6).

132.   The Defendants each received proceeds, directly or indirectly, from the collection of the Loan.

133.   The Defendants each utilized a portion of the income derived from the collection of the Loan to acquire or maintain, directly or indirectly, interest or control in an enterprise.

134.    The Defendants utilized the internet, telephone and mail to reach across state lines in the operation of the enterprise, including through

      a.    collection calls,

      b.    credit reporting,

      c.    ACH withdrawals from Mr. Oehlwein's Florida bank account, and/or

      d.    ACH deposits to Mr. Oehlwein's Florida bank account.

135.    The Defendants' business model evinces their knowledge of the illegal nature of the Loan, as they go to great lengths to obfuscate how, and by whom, the Loan was made, attempting to deceive consumers into believing that they have no legal recourse against its enforcement.

136.    Accordingly, the Defendants are jointly and severally liable to Mr. Oehlwein for treble damages, costs, and attorney's fees pursuant to 18 U.S.C. § 1964(c).

**COUNT III**
**VIOLATIONS OF RICO, 18 U.S.C § 1962(c)**
**ALL DEFEDNANTS**

137.    Mr. Oehlwein adopts and incorporates Paragraphs 1 – 120 as if fully restated herein.

138.    The Defendants, through their joint operation of Arrowhead Advance, constitute an "enterprise" as defined by 18 U.S.C. § 1961(4).

139.    The Loan was made to a Florida resident, in Florida, and charged an annual interest rate more than twice Florida's maximum permitted rate making the Loan an "unlawful debt" pursuant to 18 U.S.C. § 1961(6).

140.    The Defendants each associated with the enterprise or participated in the affairs of the enterprise, which existed for the purpose of collection unlawful debts, including the Loan.

141.    The Defendants' participation in the enterprise caused Mr. Oehlwein to repay amounts on the Loan.

142.    The Defendants utilized the internet, telephone and mail to reach across state lines in the operation of the enterprise, including through

   a.    collection calls,

   b.    credit reporting,

   c.    ACH withdrawals from Mr. Oehlwein's Florida bank account, and/or

   d.    ACH deposits to Mr. Oehlwein's Florida bank account.

143.    Accordingly, the Defendants are jointly and severally liable to Mr. Oehlwein for treble damages, costs, and attorney's fees pursuant to 18 U.S.C. § 1964(c).

## COUNT IV
## <u>VIOLATIONS OF RICO, 18 U.S.C § 1962(d)</u>
## <u>ALL DEFEDNANTS</u>

144.    Mr. Oehlwein adopts and incorporates Paragraphs 1 – 143 as if fully restated herein.

145.    The Defendants, through their joint operation of Arrowhead Advance, constitute an "enterprise" as defined by 18 U.S.C. § 1961(4).

146.    The Loan was made to a Florida resident, in Florida, and charged an annual interest rate more than twice Florida's maximum permitted rate making the Loan an "unlawful debt" pursuant to 18 U.S.C. § 1961(6).

147.    The Defendants conspired with each other, and other entities and individuals, to issue and collect unlawful debts through Arrowhead Advance.

148.    The Defendants were each aware of the goals of the enterprise and each took actions in furtherance of this conspiracy when, at various times, the Defendants have:

a.    facilitated a "rent-a-tribe" scheme to avoid state usury laws;

b.    provided funding for the Loan;

c.    made the Loan to Mr. Oehlwein;

d.    requested and obtained a consumer credit report regarding Mr. Oehlwein;

e.    initiated ACH deposits to Mr. Oehlwein's bank account;

> f.    initiated ACH withdrawals from Mr. Oehlwein's bank account; and/or,
>
> g.    attempted collection of the Loan.

149.    The Defendants each agreed to participate in the conspiracy and agreed to the overall objective of the conspiracy – to collect unlawful loans through Arrowhead Advance.net.

150.    The Defendants utilized the internet, telephone, and/or mail to reach across state lines in furtherance of their conspiracy.

151.    Accordingly, the Defendants are jointly and severally liable to Mr. Oehlwein for treble damages, costs, and attorney's fees pursuant to 18 U.S.C. § 1964(c).

**COUNT V**
**<u>VIOLATIONS OF THE CRCPA, § 772.103(1), FLA. STAT.</u>**
**<u>ALL DEFEDNANTS</u>**

152.    Mr. Oehlwein adopts and incorporates paragraphs 1 – 120 as if fully stated herein.

153.    The Defendants, through their joint operation of Arrowhead Advance, constitute an "enterprise" as defined by § 772.102(3), Fla. Stat.

154.    The Loan was made to a Florida resident, in Florida, and charged an interest rate in excess of 25% per annum – in violation of § 687.071(2), Fla. Stat.

155.    The Loan is thus an unlawful debt per § 772.102(2)(a)(3), Fla. Stat.

156.    The Defendants received proceeds directly or indirectly from the collection of the Loan.

157.    The Defendants used or invested, directly or indirectly, a portion of the income derived from the collection of the Loan to acquire interest in real property or operate or establish an enterprise.

158.    At all times relevant, the Defendants acted with criminal intent, as evidenced by their business model, whereby they go to great lengths to obfuscate how, and by whom, the Loan was made, attempting to deceive consumers into believing that they have no legal recourse against its enforcement.

159.    Accordingly, the Defendants are jointly and severally liable to Mr. Oehlwein for treble damages, costs, and attorney's fees pursuant to § 772.104(1), Fla. Stat.

## COUNT VI
## VIOLATIONS OF THE CRCPA, § 772.103(2), FLA. STAT.
## ALL DEFEDNANTS

160.    Mr. Oehlwein adopts and incorporates paragraphs 1 – 120 as if fully stated herein.

161.    The Defendants, through their joint operation of Arrowhead Advance, constitute an "enterprise" as defined by § 772.102(3), Fla. Stat.

162.    The Loan was made to a Florida resident, in Florida, and charged an interest rate in excess of 25% per annum – in violation of § 687.071(2), Fla. Stat.

163.    The Loan is thus an unlawful debt per § 772.102(2)(a)(3), Fla. Stat.

164.    The Defendants received proceeds directly or indirectly from the collection of the Loan.

165.    The Defendants utilized a portion of the income derived from the collection of the Loan to acquire or maintain, directly or indirectly, interest in or control of an enterprise or real property.

166.    Accordingly, the Defendants are jointly and severally liable to Mr. Oehlwein for treble damages, costs, and attorney's fees pursuant to § 772.104(1), Fla. Stat.

## COUNT VII
## VIOLATIONS OF THE CRCPA, § 772.103(3), FLA. STAT.
## ALL DEFEDNANTS

167.    Mr. Oehlwein adopts and incorporates paragraphs 1 – 120 as if fully stated herein.

168.    The Defendants, through their joint operation of Arrowhead Advance, constitute an "enterprise" as defined by § 772.102(3), Fla. Stat.

169.    The Loan was made to a Florida resident, in Florida, and charged an interest rate in excess of 25% per annum – in violation of § 687.071(2), Fla. Stat.

170.    The Loan is thus an unlawful debt per § 772.102(2)(a)(3), Fla. Stat.

171.    The Defendants' participation in the enterprise caused Mr. Oehlwein to repay amounts on the Loan.

172.    The Defendants received proceeds directly and indirectly from the collection of the Loan.

173.    The Defendants associated with the enterprise and participated in the affairs of the enterprise, directly or indirectly, to collect on the Loan.

174.    Accordingly, the Defendants are jointly and severally liable to Mr. Oehlwein for treble damages, costs, and attorney's fees pursuant to § 772.104(1), Fla. Stat.

## COUNT VIII
## VIOLATIONS OF THE CRCPA, § 772.103(4), FLA. STAT.
## ALL DEFEDNANTS

175.    Mr. Oehlwein adopts and incorporates paragraphs 1 – 120 and 152 - 174 as if fully stated herein.

176.    The Defendants, through their joint operation of Arrowhead Advance, constitute an "enterprise" as defined by § 772.102(3), Fla. Stat.

177.    The Loan was made to a Florida resident, in Florida, and charged an interest rate in excess of 25% per annum – in violation of § 687.071(2), Fla. Stat.

178.    The Loan is thus an unlawful debt per § 772.102(2)(a)(3), Fla. Stat.

179.    The Defendants conspired with each other, or other persons, to issue and collect unlawful debts, including the Loan.

180.   The Defendants were each aware of the goals of the enterprise and each took actions in furtherance of this conspiracy when, at various times, the Defendants have:

     a.    facilitated a "rent-a-tribe" scheme to avoid state usury laws;

     b.    provided funding for the Loan;

     c.    issued the Loan to Mr. Oehlwein;

     d.    requested and obtained a consumer credit report regarding Mr. Oehlwein;

     e.    initiated ACH deposits to Mr. Oehlwein's bank account;

     f.    initiated ACH withdrawals from Mr. Oehlwein's bank account; and/or,

     g.    attempted collection of the Loan.

181.   The Defendants each agreed to participate in the conspiracy and agreed to the overall objective of the conspiracy – to collect unlawful loans through Arrowhead Advance.net.

182.   Accordingly, the Defendants are jointly and severally liable to Mr. Oehlwein for treble damages, costs, and attorney's fees pursuant to § 772.104(1), Fla. Stat.

## PRAYER FOR RELIEF

**WHEREFORE**, Mr. Oehlwein respectfully requests this Court enter judgment against the Defendants, jointly and severally, for:

a.    Treble actual damages, pursuant to 18 U.S.C. § 1964(c) and/§ 772.104(1), Fla. Stat., as pled herein;

b.    Reasonable costs and attorneys' fees;

c.    Such other relief that this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Mr. Oehlwein hereby demands a jury trial on all issues so triable.

Respectfully submitted on **October 5, 2022**, by:

SERAPH LEGAL, P. A.

/s/ *Carolyne Moomaw*
Carolyne Moomaw, Esq.
Florida Bar No.: 21889
cmoomaw@seraphlegal.com
1614 N. 19th St.
Tampa, FL 33605
Tel: 813-567-1230
Fax: 855-500-0705
*Counsel for Plaintiff*

**ATTACHED EXHIBIT LIST**

A     Plaintiff's Clarity Report dated June 13, 2022
B     Arrowhead Example Installment Loan Rates and Payment Schedules
C     Arrowhead Domain Registration
D     Trans Union Inquiry Example